UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MELANIE HOWARD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-cv-00150-JAW |
| | ) | |
| DEMO SALVAGE | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY**

A personal injury plaintiff filed a *Daubert*[1] motion to exclude the proposed testimony of the defendant's vocational expert. The Court denies the motion because it finds the expert's proffered testimony sufficiently reliable to survive the *Daubert* challenge and it concludes that any asserted deficiencies in the expert's testimony may be addressed through proper objections or cross-examination.

**I.   BACKGROUND**

   **A.   Procedural History**

On April 5, 2018, Ms. Howard filed a complaint against Demo Salvage asserting claims of negligence and vicarious liability. *Compl.* (ECF No. 1). On May 25, 2018, Demo Salvage filed an answer, denying both claims. *Answer* (ECF No. 6). With jury selection scheduled for February 5, 2019 and trial set to begin on February 25, 2019, on January 4, 2019, Ms. Howard filed a motion to exclude the proposed

---

[1]   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

testimony of one of Demo Salvage's expert witnesses, Edmond Provder. *Pl.'s Mot. to Exclude Expert Test. of Edmond Provder* (ECF No. 29) (*Pl.'s Mot.*). On January 18, 2019, Demo Salvage responded to Ms. Howard's motion to exclude Mr. Provder's proposed testimony. *Def.'s Opp'n to Pl.'s Mot. to Exclude Expert Test. of Edmond Provder* (ECF No. 46) (*Def.'s Opp'n*).

### B.  Demo Salvage's Expert

#### 1.  Demo Salvage's Expert Designation of Edmond Provder

On November 20, 2018, Demo Salvage made a supplemental expert designation of Mr. Provder as a "vocational, rehabilitation, and lifecare planning expert." *Def.'s Opp'n*, Attach. 1, *Def.'s Suppl. Designation of Experts* at 1 (*Def.'s Expert Designation*); *Pl.'s Mot.*, Attach. 4 at 1. Mr. Provder holds a Bachelor of Science degree and a Master of Education degree in rehabilitation counseling from Pennsylvania State University and has received doctoral credit hours in rehabilitation counseling from New York University and post-graduate credit hours from the University of Florida's Intelicus Life Care Planning Program for catastrophic case management. *Def.'s Opp'n* Attach. 1, *Professional Qualifications of Edmond A. Provder* at 20. For the past thirty-seven years, Occupational Assessment Services has employed Mr. Provder as a vocational expert/life care planner. *Id.* Mr. Provder has also been employed as a vocational consultant for Social Security Disability hearings and a supervisor of vocational facilities at Mount Sinai Hospital. *Id.*

2

According to Demo Salvage, Mr. Provder plans to "opine on Ms. Howard's employability, transferable skills learned from past occupations, and earning capacity in the local labor market, as well as to make a determination as to the feasibility of her receiving vocational rehabilitation services." *Def.'s Expert Designation* at 1. In Mr. Provder's opinion, Ms. Howard "can be employed as a Pipefitter and Pipefitter Helper . . . [and] she has the ability to access the labor market and can perform jobs requiring Sedentary, Light, Medium, and Heavy Physical demands which are within her vocational capacity." *Id.*

## 2. Edmond Provder's Expert Report

On October 17, 2018, Mr. Provder prepared a report on Ms. Howard's employability and earning capacity. *Def.'s Opp'n*, Attach. 2, *Edmond Provder's Expert Report*, at 1 (*Provder's Report*).[2] Mr. Provder's methodology consisted of six parts: (1) "reviewing the deposition and medical documents, as well as other documents that describes the evaluee's condition;" (2) performing a vocational analysis of Ms. Howard's past work history and classifying her work history using the United States Department of Labor's Dictionary of Occupational Titles and "O*Net" to determine the physical demands, skill level, "Specific Vocational Preparation (SVP)," and "the General Educational Development (GED) of Ms. Howard's employment" to ascertain Ms. Howard's pre-injury vocational capacity; (3) use of the "Vocational Diagnosis and Assessment of Residual Employability (VDARE) process" to determine Ms. Howard's

---

[2] The pagination of the report as filed in the ECF system differs from the pagination of Mr. Provder's report. The Court uses the pagination in the Provder Report.

3

aptitudes, skills, and skill level in relation to the transferability of those skills to other jobs within her vocational capacity; (4) conducting "[a] Labor Market Access (LMA) analysis . . . to determine Ms. Howard's ability to enter the labor market given her skill and vocational capacity;" (5) formulating an opinion based on a review of all the materials "as to Ms. Howards post-injury vocational capacity, employability, earning capacity, and the feasibility of her receiving vocational rehabilitation services;" (6) if Ms. Howard is determined to be employable, analyzing labor market statistics or private labor studies to "determine whether jobs exist that Ms. Howard can perform within her vocational capacity and the current earnings of these occupations." *Id.* at 2-3. In his report, Mr. Provder stated that he reviewed various hospital records, physician records, diagnostic records, and legal records. *Id.* at 4-7.

In his October 17, 2018 report, Mr. Provder expressed the opinion that Ms. Howard "can be employed as a Pipefitter and Pipefitter Helper." *Id.* at 22. He opined that she "could be competitively placed in the job market on a full-time, competitive basis." *Id.* He concluded that she "is able to transfer her skills to such Sedentary and Light semi-skilled occupations as Information Clerk, Order Clerk, or Parts Sale Clerk." *Id.* at 23. He listed nine semi-skilled occupations with annual salary ranges from a low of $24,292 to a high of $46,190 that he concluded Ms. Howard "had the vocational capacity to perform." *Id.* He wrote that in his opinion, as a vocational expert, Ms. Howard "could perform these occupations on a **sustained, full-time, regular, competitive basis**." *Id.* (emphasis in report). He stated that "Ms. Howard has sustained no loss of earnings due to her injuries" and that her "ability to replace

4

her earnings is dependent on her motivation to remain employed." *Id.*

## II. POSITIONS OF THE PARTIES

### A. Melanie Howard's Memorandum

Melanie Howard moves to exclude Mr. Provder's expected testimony on two bases: (1) his testimony is not sufficiently reliable to be admissible; and (2) he reaches conclusions beyond his expertise. *Pl.'s Mot.* at 1. Ms. Howard contends that Mr. Provder's expected testimony is not reliable because he employed a flawed methodology to reach his conclusions. *Id.* at 4, 7. Ms. Howard points out that Mr. Provder wrote in his report that "a review is made of all of the materials and an opinion is formulated as to Ms. Howard's post-injury vocational rehabilitation services." *Id.* at 4 (quoting *Provder Report* at 3). But Ms. Howard says that Mr. Provder did not review all the materials available to him, such as Ms. Howard's experts' depositions, and that he failed to conduct an interview of Ms. Howard. *Id.* at 5. In Ms. Howard's view, Mr. Howard "violated his own methodology and that of any reasonable expert by failing to review information that would have helped to inform his opinions, which he agreed would have been the better practice." *Id.* at 5. Considering this incomplete review, Ms. Howard claims Mr. Provder had an inadequate foundation for his opinions. *Id.* at 7.

Ms. Howard also argues that Mr. Provder exceeded the scope of his expertise because he opined that he did not believe Ms. Howard's psychological condition (PTSD) had a lot of impact on her ability to work. *Id.* at 5-7. Ms. Howard notes that two of her expert witnesses, Dr. Lubit, a psychiatrist, and Nickie Cole, Ms. Howard's

5

PTSD therapist, directly disagree with Mr. Provder. *Id.* Ms. Howard says Mr. Provder "cherry picks and then misinterprets a single phrase from the final paragraph of Dr. Lubit's report . . . as support for his opinion that [Ms. Howard] could work, if only she were motivated to." *Id.* at 5. Ms. Howard asserts "[Mr.] Provder is grasping at straws. He is substituting his own psychological opinion for those of the true psychological experts." *Id.* at 6. Ms. Howard claims Mr. Provder "attempts to qualify himself [as a mental health expert] by saying he has worked with people with PTSD who have returned to work . . .." *Id.* at 7.

Ms. Howard contends that Mr. Provder's lack of foundation by failing to engage in appropriate methodology is "inextricably entwined" with his giving opinions outside his expertise. *Id.* at 8. Lastly, Ms. Howard states, "[e]ven if the Court were inclined to allow the foundation [challenge to Mr. Provder's testimony] . . . to be the subject of vigorous cross-examination rather than exclusion," Mr. Provder's testimony should nevertheless be excluded in its entirety because Mr. Provder cannot give his opinion about her employability without stating his opinion as to her psychological state. *Id.*

### B. Demo Salvage's Opposition Memorandum

Demo Salvage asserts Ms. Howard's motion is premised on whether Mr. Provder's proffered testimony is based on a reliable scientific foundation. *Def.'s Opp'n* at 4.[3] Demo Salvage argues that Ms. Howard "takes pains to find fault in Mr. Provder's methodology when there is none." *Id.* at 5. Demo Salvage contends that

---

[3] The Court refers to the ECF numbering for pincites because Demo Salvage's opposition memorandum does not include pagination.

6

Ms. Howard's argument that Mr. Provder did not review "all the materials" is overblown considering that Mr. Provder reviewed all of the Ms. Howard's "expert reports prior to generating his own, and prior to his deposition . . . [and that Ms. Howard's] expert witnesses testified in conformation with their previously generated reports." *Id.* Demo Salvage says that Ms. Howard's contention that Mr. Provder violated his own methodology by not reviewing her expert witnesses' depositions is "specious." *Id.* Demo Salvage highlights a portion of Ms. Howard's deposition in which Ms. Howard states, "I was . . . trying to get them . . . to fire me []" to undercut Ms. Howard's claim that Mr. Provder's opinion as to her motivation to work is outside his area of expertise because "[n]o specific expertise or training is required to include this testimony in one of Ms. Howard's vocational prognosis or her motivation to work in an accommodative job." *Id.* at 5-6.

## III. DISCUSSION

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert*, the United States Supreme Court directed a "gatekeeping role for the judge," to determine whether Rule 702's requirements are met in any given case. 509 U.S. at 597. A judge exercising this role must "ensure

7

that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Vargas*, 471 F.3d 255, 261 (1st Cir. 2006) (quoting *Daubert*, 509 U.S. at 597); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending *Daubert's* holding to technical and other specialized expert testimony). The inquiry under Rule 702 is a "flexible one." *Vargas*, 471 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594). "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).

### B. Analysis

#### 1. Methodology

"*Daubert* does not require that a party who proffers expert testimony carry the burden of proving . . . the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon 'good grounds, based on what is known . . . it should be tested by the adversary process . . . .'" *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (citing *Daubert*, 509 U.S. at 590, 596). In determining whether an expert's opinions are sufficiently reliable, a court considers nonexclusive factors such as: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 14 (1st Cir.2011) (citation omitted).

The Court considers such factors to ensure that the proffered expert testimony

8

is based on "scientific knowledge rather than guesswork." *Ruiz–Troche*, 161 F.3d at 81 (citing *Daubert*, 509 U.S. at 592). Neither Rule 702 nor *Daubert* "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz–Troche*, 161 F.3d at 81 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 137 (2007)). Rule 702 "requires that expert testimony be based on sufficient facts or data. Sufficient implies that expert testimony can be based on less than the entire universe of facts or data that could be provided to the expert." *Grande Vill. LLC v. CIBC Inc.*, No. 114CV3495NLHJS, 2018 WL 3085207, at *4 (D.N.J. June 22, 2018).

Ms. Howard argues that Mr. Provder's proffered testimony is so significantly unreliable that it warrants complete exclusion because he did not follow his own methodology in that he did not "review . . . all of the materials," including the three depositions of Ms. Howard's expert witnesses and updated medical records which were taken after he formulated his report, as proscribed in part five of his methodology framework, or personally interview her or review her deposition as provided for in part one of the methodology. *Pl.'s Mo.* 6-7. In part one of Mr. Provder's methodology, he reviews information on Ms. Howard's background and medical treatment, and in part five, he considers all the available materials to formulate his opinion as to Ms. Howard's post-injury vocational capacity. *Provder's Report* at 5-6. In the section titled "formulation of opinion", Mr. Provder states his "opinions are based on the information available to [him] at the time of [his] evaluation . . . [and

9

that he] reserve[s] the right to modify [his] vocational opinions." *Id.* at 7.

On this record, the Court does not conclude that Mr. Provder's expert opinion is "so fundamentally unsupported that it can offer no assistance to the jury." *See Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D. Me. 2005) (quoting *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005)). Mr. Provder's report largely tracks his six-part methodology, and his opinions are based on the information he had when he wrote his report as well as on his professional judgment, experience as a vocational expert, and labor market research. Ms. Howard's argument that Mr. Provder "violated his own methodology" either misses the mark or overstates the degree of the violation. Ms. Howard latches her argument partly onto the fifth part of Mr. Provder's methodology, where he states "[a] review is made of all the materials and an opinion is formulated . . .." *Provder's Report* at 6. Ms. Howard believes this means because Mr. Provder did not consider "all the materials," which includes documents and information produced after his report, Mr. Provder violated his methodology.

However, Mr. Provder's report states that he formulates his opinions "on the information available to [him] at the time of evaluation." *Id.* at 7. As Ms. Howard notes, Mr. Provder reserved the right to modify his vocational opinions in light of additional opinions, and Mr. Provder's deposition illustrates that subsequent information could change some of his conclusions. *See Def.'s Opp'n,* Attach. 3, *Tr. of Teleconferenced Deposition of Edmond Provder* at 20:2 – 20:15; 31:9 – 31:18 (ECF No. 46-3) *(Provder Dep. Tr.)* The fact that Mr. Provder may not have reviewed the

deposition of Ms. Howard, or personally interviewed her by the time of his deposition goes to the weight and credibility of Mr. Provder's opinions, not to their admissibility. *See Grande Vill., LLC*, 2018 WL 3085207, at *4 ("Sufficient implies that expert testimony can be based on less than the entire universe of facts or data that could be provided to the expert").

Although Ms. Howard asserts she is challenging Mr. Provder's testimony based on his methodology, her argument for excluding his expected testimony seems closely tied to her belief that his opinions lack an adequate foundation. *Pl.'s Mot.* at 7 ("Nonetheless, he went forward in deposition testimony with the same opinion he expressed in his report with an even more inadequate foundation for his opinions on Melanie's employability"). In *Oliver-Gely v. HI Development PR Corp.*, 472 F. Supp. 2d 140 (D.P.R. 2007), the defendants sought to exclude the plaintiffs' expert testimony who was expected to testify as to the causation between a decedent's skin lesion suffered as a result of a fall in a hotel bathroom and a subsequent bacterial infection. *Id.* at 142. The defendants argued that the expert's testimony should be excluded because he used a flawed methodology to reach his conclusions given that he had "reached his opinions without having seen a complete copy of [the decedent's] medical records." *Id.* at 144. The court denied the motion, stating that "challenges to the methodology used by an expert witness are usually adequately addressed by cross-examination." *Id.* (citing *United States v. Diaz*, 300 F.3d 66, 76–77 (1st Cir. 2002)).

Similarly, in *Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 WL 173475, at

11

*2 (D. Me. Jan. 16, 2013), the United States Postal Service (USPS) sought to exclude a plaintiff's expert witness who was expected to testify, among other things, to the plaintiff's "medical ability to return to employment with the USPS, and her work capacity subsequent to her termination by the USPS." *Id.* at *1. USPS argued that the expert spent too little time on the case, reviewed a limited set of data, and based his opinions on factual misunderstandings. *Id.* The Court rejected these arguments as rendering the expert's expected testimony inadmissible, and stated "[w]hen the 'adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion.'" *Id.* at *2 (quoting *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010) (quoting *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 119 (D. Me. 2010))).

The Court concludes that Mr. Provder's expected testimony is sufficiently reliable, and that any deficiencies in his methodology or the foundation for his conclusions can be adequately addressed through cross-examination. *See Brown*, 402 F. Supp. 2d at 308 (explaining that a party seeking to exclude testimony because of the factual basis underlying an expert's opinions are generally not a question of admissibility, but rather credibility suitable for a jury determination).

### 2. Scope of Expertise

Ms. Howard seeks to exclude Mr. Provder's testimony because Mr. Provder "substituted his own opinion of her psychological condition in place of the opinions of the PTSD experts, Dr. Lubit and Nickie Cole, both of whom opined that her mental

condition rendered her permanently unemployable."[4] *Pl.'s Mot.* at 7. Ms. Howard points to Mr. Provder's deposition where he states: "I don't disagree that she has a psychological condition. I disagree that the psychological condition has a lot of impact on her ability to work." *Id.* at 5, 7. Furthermore, as evidence of Mr. Provder exceeding his expertise, Ms. Howard observes that Mr. Provder admitted if Ms. Howard's psychological conditions as listed in Audrey Cowart's report, after consultation with Dr. Lubit, were "severe," Ms. Howard would not be employable. *Id.*

Demo Salvage dismisses Ms. Howard's contention because it says that Mr. Provder's opinion is grounded in his view of Ms. Howard's motivation to work, which "[n]o specific expertise or training is required to include this testimony in one's evaluation of Ms. Howard's vocational prognosis or her motivation to work in an accommodative job that was provided for her by her employer." *Def's Opp'n* at 5-6.

Mr. Provder's deposition reads:

> Q. Right. And if you go back to Page 6 of [Dr. Esponnette's] opinion -- I mean, of his report; the Conclusion section, he talks about the physical issues in the first paragraph. And in the second paragraph, he said, However, in terms of affecting her life, the greatest problem appears to be the psychologic sequelae to the injury, with readily noted post-traumatic stress disorder. Not being an expert in psychology in general nor post-traumatic stress disorder specifically, we did not spend much time discussing this issue, but it is exceptionally obvious when reviewing her medical records.
>
> A. Yes. That's what it states.

---

[4] On this point, Ms. Howard's argument has a Catch-22 aspect. J. HELLER, CATCH-22 (1961). The jury will answer whether Ms. Howard is believable, and of course it is her burden to prove she is. If Dr. Lubit and Nickie Cole are relying on the accuracy of the symptoms Ms. Howard reported to them in arriving at their conclusions that she is unemployable and if Mr. Provder must accept Dr. Lubit and Nickie Cole's opinions, then, under Plaintiff's theory, the defense must accede to her credibility before its expert will be allowed to express his expert opinion.

13

Q. Okay. And you disagree with that?

A. No, I don't disagree that she has a psychological condition. I disagree that the psychological condition has a lot of impact on her ability to work. In fact, the ability to work and getting back to work will probably help her deal with some of her psychological symptomatology.

. . . . . . . . . . . .

Q. Okay. [Dr. Lubit's] ultimate finding is that she has post-traumatic stress disorder and that she basically cannot function as a normal person because of that post-traumatic stress disorder. Do you agree with that? Not -- not that you agree with the concept, but do you agree that that is his finding?

A. Yes. And that's his finding. But if you look at Page 12 of his report at the last paragraph, he gives a notation of why she has some of these feelings. And in fact, as I noted before, that some of these feelings would be negated if she would turn to some type of gainful employment. It would give her a sense of purpose.

. . . . . . . . . . . .

Q. So if you -- even though you say these speak for themselves and you can't say one way or the other whether they're -- whether you agree with them, if all of these things are true about Melanie's psychiatric state, would you agree that she does not have a functional work capacity?

[Objection]

A. Yes. If she had a severe -- severe limitations in each of these areas, then she would not be employable in the jobs that I have listed. But if she had a mild to moderate range of these areas, then she could be employable. In fact, I think, as I previously stated, that if she was employed and had a job that she was able to perform, in my opinion as a vocational rehab counselor, a lot of these things are going to be diminished because they're going to give her self-worth and some meaning to her life, which is part of what Dr. Lubit is talking about in his report.

. . . . . . . . . . . .

Q. All right. Ms. Cowart indicates that -- primarily that she -- she

> agrees that she has some physical abilities to do some work, but she bases her lack of ability to sustain employment primarily on psychological bases. And do you disagree with that?
>
> A. Well, number one, I believe that given the physical restrictions noted by the IME doctor, that Ms. Howard has the capability to perform work requiring at least sedentary or light physical demands. As per our previous conversation regarding Dr. Lubit's assessment, as he notes in Ms. Cowart's report, reported to Ms. Cowart, if she has those capabilities and those limitations, if they're mild or to moderate, she could go back and become employed. If they're severe, then she's unemployable.
>
> Q. He was deposed last week and said that it was the single most -- the single-worst case of single-exposure PTSD that he had ever seen in his career.
>
> [Objection]
>
> Q. Does that change your opinion?
>
> A. No, it doesn't. I've had -- you know, I've been doing this for a long time. I've had many individuals that have PTSD, and many of them have been able to overcome their PTSD with therapy and return to work and perform gainful work activities. So the fact that this is the worst that the psychiatrist has seen, that's no -- no moment to me. You know, I don't know what type of a practice he has, but I work with people that have very severe and catastrophic injuries, and many of them as a consequence have PTSD. But even though they have a PTSD diagnosis, they're able to return to some type of gainful employment.

*Provder Dep. Tr.* at 15:9 – 16:6; 16:13 – 17:3; 19:17 – 20:15; 26:7 – 27:22. After being asked if the PTSD symptoms listed in a June 2016 letter from Ms. Howard's primary care physician are largely intact today, making Ms. Howard a poor candidate for employment, *see id.* at 28:25 – 29:3; 29:21 – 30:17; 31:5 – 31:6, Mr. Provder replied that "if Ms. Howard's condition to those factors are severe and have been severe since [June 2016], then she would not be employable. But . . . she did go back to work for a period of time after this letter was written and continued to work until January

15

19th, 2017." *Id.* at 31:9 – 31:18.

Mr. Provder's opinion on the impact of Ms. Howard's psychological condition on her employability seems to be grounded in his prior experience with individuals who suffered from PTSD and returned to work, doubts about her motivation to seek work derived from what he viewed as her documented lack of purpose, and the fact that Ms. Howard returned to work, albeit relatively briefly, after her injury. In the Court's view, Mr. Provder may opine, based on his experience and professional expertise, that Ms. Howard's PTSD diagnosis does not necessarily mean she has no earning capacity.

Given the record, the Court does not conclude that Mr. Provder is substituting his opinions for those of mental health professionals. "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." *Levin*, 459 F.3d at 78 (citing *Daubert*, 509 U.S. at 588). Ms. Howard may object to Mr. Provder's specific testimony and vigorously cross-examine him to illustrate that the jury should give his opinions little or no weight. *See Guzman-Fonalledas v. Hosp. Expanol Auxilio Mutuo*, 308 F. Supp. 3d 604, 609 (D.P.R. 2018) ("Should [the expert witness] exceed the bounds of her intellectual authority, Defendants will be able to highlight such excesses in cross-examination, and the jury will afford the pertinent weight to her testimony").

"Once a trial judge determines the reliability of the expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to the inferences and conclusions he draws from it and any flaws in his opinion may be exposed through cross-examination or competing expert testimony." *Knowlton v.*

16

*Bankers Life & Cas. Co.*, 882 F. Supp. 2d 129, 130 (D. Me. 2012) (quoting *Brown*, 402 F. Supp. 2d at 308). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## IV.  CONCLUSION

The Court DENIES Melanie Howard's Motion to Exclude Expert Testimony of Edmond Provder (ECF No. 29).

SO ORDERED.

> /s/ John A. Woodcock, Jr.
> JOHN A. WOODCOCK, JR.
> UNITED STATES DISTRICT JUDGE

Dated this 31st day of January, 2019